MILTON WASMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wasman v. Comm'r
Docket No. 5515-77. United States Tax Court
T.C. Memo 1982-281; 1982 Tax Ct. Memo LEXIS 465; 43 T.C.M. (CCH) 1434; T.C.M. (RIA) 82281; May 20, 1982. *465 Held: (1) Respondent's reconstruction of petitioner's income sustained. (2) Sale of stock by petitioner allegedly acting as trustee resulted in income to petitioner on the ground that petitioner could not substantiate that he was acting in a fiduciary capacity. (3) Underpayments for the years 1967-1970 were due to fraud and accordingly respondent's imposition of the fraud penalty under sec. 6653(b) for each of the years is sustained. Sidney A. Soltz, for the petitioner. Hans G. Tanzler, III, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies and additions to petitioner's Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a)
Sec. 6654
Sec. 6653(b)
1965
$ 287,86
$ 71.97
$ 14.39
$ 9.20
1966
328.30
82.08
16.42
10.50
1967
42,536.86
1,361.18
21,268.43
1968
52,299.58
1,673.59
26,149.70
1969
80,172.59
2,565.33
40,086.30
1970
19,608.14
9,804.07
Due to concessions, the issues remaining for decision are: *466 (1) The extent to which petitioner had unreported income for the years 1967-1970. (2) Whether petitioner realized income on the sale of shares of stock of Estates, Inc. (3) Whether any part of the underpayments in petitioner's Federal income taxes for the years 1967-1970 was due to fraud. FINDINGS OF FACT Petitioner Milton Wasman (hereinafter petitioner) resided in Miami, Florida, at the time he filed his petition herein. A timely 1970 joint Federal income tax return was filed by petitioner and Mildred Wasman with the Internal Revenue Service Center at Chamblee, Georgia. [2] Petitioner did not file Federal income tax returns for the years 1962 through 1969. For approximately 25 years including the years in issue petitioner was self-employed in the practice of law. Additionally, during the taxable years 1967 through 1969, petitioner was president *467 of Estates, Inc., a publicly held corporation, and was a member of its board of directors for all years in issue. For the years 1967 through 1970 petitioner and/or his wife, Mildred, maintained bank accounts at the following banks: (1) Riverside Bank (Milton Wasman - office account) (2) Banco Popular de Puerto Rico (Milton Wasman - checking account) (3) City National Bank of Miami (Milton Wasman - office account) (4) Southeast National Bank of Coral Way (Milton Wasman - checking account) (5) Coral Gables Federal Savings and Loan (Mildred Wasman - savings account) (6) First Federal Savings and Loan (Milton Wasman - savings account). Petitioner's taxable gross income for 1967 through 1970 includes but is not limited to the following amounts: 1967
1968
1969
1970
Net Bank Deposits
$ 46,928.89
$ 31,135.10
$ 23,247.21
$ 62,095.27
Nondeposited legal
fees
3,500.00
1,150.00
8,422.64
9,243.00
Bond Interest
156.85
Dividends
8.00
85.00
Sale of Securities
493.84
Total
$ 50,585.74
$ 32,786.94
$ 31,754.85
$ 71,338.27
Petitioner did not receive any inheritances, legacies or devises during the years 1967 through 1970. Petitioner's deductions from income for the years 1967 through 1970 (exclusive of personal exemptions and *468 the standard deduction) are as follows: 1967
1968
1969
1970
Business expenses
$ 19,171.03
$ 8,564.94
$ 5,745.73
$ 31,358.83
Sale of securities
331.56
Sale of capital
asset
1,000.00
Total
$ 19,502.59
$ 8,564.94
$ 5,745.73
$ 32,358.83
As already noted, for the years 1967 through 1969 petitioner was president of Estates, Inc. (Estates). Estates was the parent company of a wholly-owned subsidiary Florida Guaranty Land Co. (Florida Guaranty). During the years 1967 and 1968 petitioner received checks from Florida Guaranty. Some of these checks were not deposited in any bank account by petitioner. Such nondeposited checks from Florida Guaranty were made payable to Milton Wasman and were cashed. These checks amounted to $ 11,750 in 1967 and $ 340 in 1968. $ 11,000 of the $ 11,750 tendered to petitioner in 1967 represented legal fees. For the years in issue Florida Guaranty had an account on its books entitled "Loans and Exchanges - Milton Wasman." Credits to this account are traceable to the cash receipts journal and to various journal entries expensing legal fees. The credits to this account for the years 1967 through 1970 were as follows: 1967
$ 38,744.00
1968
65,944.47
1969
20,085.94
1970
10,382.50
The parties *469 have stipulated that $ 3,300.00 of the credits to the 1967 account do not represent income to petitioner. $ 39,369.47 of the $ 65,944.47 credited to petitioner's account in 1968 represented a reduction of petitioner's loan account in exchange for legal services rendered by petitioner to Florida Guaranty. The parties have further agreed that $ 3,950.00 of the 1969 credits are not income to petitioner. Finally, owing to a posting error and to a check to Florida Guaranty from Milton Wasman's office account, the parties have stipulated that $ 5,662.50 of the $ 10,382.50 of 1970 credits to the account do not represent income to petitioner. Thus respondent currently asserts that the following amounts credited to the loan and exchange account are income to petitioner: 1967
$ 35,444.00
1968
65,944.47
1969
16,135.94
1970
4,720.00
Estates was incorporated in 1959 under the laws of Washington, D.C., and for all years in issue was a publicly held corporation whose stock was sold on the over-the-counter market. On April 17, 1965, 87,000 class B common shares of stock of Estates were issued to petitioner. In 1969 petitioner caused 18,000 unissued shares of Estates stock to be captioned in the name of *470 Erma Palmer as certificate holder. Petitioner knew that Erma Palmer was a fictitious name. These 18,000 shares were the subject of an agreement between Milton Wasman, allegedly acting as trustee, and All County Investments, Inc. (All County) wherein All County attempted to borrow 18,000 shares of Estates stock. Petitioner was in a position to effect a loan to All County through his control of all the records of Estates. All County was represented in the transaction by its president Alvin Robins, who signed the loan agreement and promissory notes. The loan agreement provided: All County Investments, Inc., in consideration of the sum of $ 10.00 and other good and valuable considerations, hereby acknowledges an Agreement with Milton R. Wasman, as Trustee, for the loan to it by the Trustee of such shares of ESTATES, INC. stock as may be available, to the extent of not more than eighteen thousand (18,000) shares, which shares of stock, All County Investments, Inc. is authorized to sell by, through and on behalf of the Trustee, such stock being either stock of the corporation or other stockholders, upon the following conditions: 1. That as All County Investments, Inc. is able to effect *471 a sale, which proceeds are the proceeds of All County Investments, Inc. the Trustee agrees upon the sale of stock by All County Investments, Inc. to deliver the orginal funds to All County Investments, Inc. by endorsing over any and all checks or monies received by All County Investments, Inc.'s sales of the Estates, Inc. stock with the understanding and specific committment on behalf of All County Investment, Inc. to redliver [sic] the stock in each instance within designated time, it being understood that the stock provided by the Trustee is a loan of stock to All County Investments, Inc. for the purpose of making sales, if possible, and with the specific obligation on the part of All County Investments, Inc. to repurchase and redeliver to the Trustee all of the stock certificates borrowed within the time prescribed, it being recognized and acknowledged that the stock certificates borrowed by All County Investments, Inc. are being sold by it, either directly or through the Trustee, on its behalf, and such proceeds do not belong to the Trustee; the Trustee's sole right being to recover the stock certificates or to demand payment in the event of failure to redeliver the stock certificates. *472 All County, Investments, Inc. agrees to become personally liable to the Trustee for the repurchase or to pay to the Trustee the sum of such sale, if the stock shall not be redelivered. The stock was placed by petitioner with Cooper Investments, a stock brokerage firm, in Miami, Florida, for sale on the over-the-counter market. The brokerage account was registered under the name of Milton Wasman. Through Robins' participation, the 18,000 shares of Estates were sold for a total price net of commissions of $ 79,744.60. The net proceeds were paid by eight checks issued by Cooper Investment to Milton R. Wasman, as trustee. Wasman and Robins would go to the bank after the receipt of the checks, whereupon Wasman would endorse the checks, the checks would be cashed and Robins would leave with the money. Robins used the money for the initial financing of Land Services, Inc., a corporation of which he was president. All County thereafter repurchased shares of Estates stock in the open market in order to repay the shares it had borrowed. On April 7, 1971, petitioner was visited at his Miami office by two Internal Revenue agents. They disclosed to petitioner that they were unable to locate *473 his 1969 return. Petitioner then produced an unsigned document which he claimed was a copy of his 1969 tax return. He asserted that he was quite certain that either he or his secretary had mailed the original return. The copy of the purported return showed a liability of $ 1,967.83. When asked to produce a cancelled check to evidence payment of the tax, petitioner indicated that he had not paid the tax. On December 12, 1973, a three count information was filed against petitioner by a United States attorney charging him with having violated section 7203 [3] *474 for taxable years 1967, 1968 and 1969. On October 22, 1974, petitioner pled guilty to one count of the information which charged that petitioner was guilty of willfully and knowingly failing to make an income tax return for the taxable year 1968 in violation of section 7203. Petitioner was cognizant of the necessity of filing income tax returns by virtue of his occupation as an attorney. In fact petitioner represented a client before the Internal Revenue Service in 1970. Furthermore income tax returns were filed by petitioner prior to 1962. Petitioner filed a timely joint Federal income tax return for 1970. However, the petitioner signed his wife's name to the return without her knowledge or permission. On several occasions during the years 1967 through 1970 petitioners' wife asked petitioner about income tax matters to which petitioner replied "trust me I'm taking care of it." On September 10, 1979, the petitioner was convicted under 18 U.S.C. Section 1542 of making a false application to obtain a passport and was sentenced to a 2-year prison term. One and one-half *475 years was suspended in substitute for 3-years probation. In his notices of deficiency dated May 19, 1977, respondent reconstructed petitioner's income through the use of the bank deposits method and by designating as income amounts credited to petitioner's loan and exchange account with Florida Guaranty. [4] Additionally, respondent determined that petitioner was taxable on the proceeds ($ 79,854.40) [5] of the sale of 18,000 shares of Estates stock. Finally, in the notices of deficiency respondent contends that part of the underpayments for each of the years 1967 through 1970 was due to fraud. In his answer to the petition, respondent asserts that if fraud is not found then petitioner is liable for additions to tax under section 6651(a)(1) for failure to file timely returns and under section 6653(a) for negligence or intentional disregard of income tax rules and regulations. OPINION The first *476 issue presented for our decision involves the extent of petitioner's unreported income for the years 1967 through 1970. As a result of concessions by the parties the issue more narrowly framed is whether certain checks received by petitioner from Florida Guaranty and certain credits to an account on the books of Florida Guaranty entitled "Loans and Exchanges--Milton Wasman" constitute gross income to petitioner. The checks involved total $ 11,750 for 1967 and $ 340 for 1968 while the credit amounts in dispute are as follows: 1967
$ 35,444.00
1968
65,944.47
1969
16,135.94
1970
4,720.00
We have found that at least $ 11,000 of the $ 12,090 received by petitioner through checks drawn by Florida Guaranty represented legal fees. It is clear that these amounts constitute gross income to petitioner by virtue of section 61(a)(1). [6] *477 We must also sustain respondent's determination as to the other $ 1,090 received by petitioner from Florida Guaranty as petitioner has introduced no evidence to rebut the presumption of correctness attaching to respondent's determination. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). We now turn to the credits to the loan and exchange account characterized by respondent as income to petitioner. Our findings indicate that these credits coincided with debits to the cash and legal fees accounts of Florida Guaranty. Respondent contends that the reduction of petitioner's debt to the corporation resulting from the direction of cash to the corporation evidences a source of funds belonging to petitioner, which, quite similar to a bank deposit, is a necessary element in the reconstruction of petitioner's income. As to credits to the loan and exchange account made concurrently with debits to the legal fees account, respondent argues that the credits constitute income to petitioner received in exchange for services rendered. Respondent's contention relative to the loan and exchange account credits must be sustained. First, it is evident that credits petitioner received in exchange for legal services must be viewed as income to petitioner under section 61(a)(1). *478 Petitioner advances no interpretation of the facts herein or of the pertinent law which directs us otherwise. Second, the record does not disclose the source of the funds which were directed to Florida Guaranty which resulted in credits to petitioner's loan and exchange account with the corporation. The failure of such a disclosure hinders petitioner upon whom the burden of proof rests on this issue. Rule 142(a).Accordingly, we must uphold respondent's determination that the credits to the account of Florida Guaranty entitled "Loans and Exchange--Milton Wasman" represent income to petitioner. The next issue we confront is whether the net proceeds of the sale of 18,000 shares of Estates stock ($ 79,744.60) constitute income to petitioner. Circumstances surrounding the sale reveal that petitioner was approached by Alvin Robins, president of All County, for the purpose of executing a loan agreement whereby All County would borrow 18,000 shares of Estates stock. The following chain of events ensued: Petitioner, in complete control of the records of Estates, caused 18,000 unissued shares of Estates stock to be captioned in the name of Erma Palmer as certificate holder. Erma Palmer *479 was a fictitious name. The shares were placed in a stock brokerage account registered in the name of Milton Wasman and were sold for a net price of $ 79,744.60. The proceeds were made payable through eight checks to Milton R. Wasman, trustee. The checks were then endorsed by Wasman and subsequently were cashed. The moneys were then taken by Alvin Robins for use in financing his own corporation. Shares of Estates stock were later repurchased by All County and returned to Estates. Petitioner's concise argument is that the stock was sold by petitioner in his fiduciary capacity (trustee) and as such no income may be ascribed to him. Petitioner casts the transaction in the form of a loan of shares of stock from Estates to All County which was later repaid and therefore argues that he participated in no realization event in his individual capacity. Respondent counters with the argument that the loan agreement herein amounted to nothing more than an agreement that petitioner, in his individual capacity, would lend the proceeds of the sale of Estates stock to All County. For the reasons which follow we agree with respondent. An express trust can be created and proved by parol evidence. *480 Grapes v. Mitchell,159 So.2d 465 (Fla. 1963); Columbia Bank for Cooperatives v. Okeelanta Sugar Cooperative,52 So.2d 670 (Fla. 1951); BayBiscayne Co. v. Baile,73 Fla. 1120, 75 So. 860 (1917). However, it is equally certain that the evidence to establish such a trust must be clear, strong conclusive and unequivocal. See Webster v. St. Petersburg Federal Savings and Loan Association,155 Fla. 412, 20 So.2d 400 (1945); McCrory Stores Corp. v. Tunnicliffe,104 Fla. 683, 140 So. 806 (1932). In the instant case we are not presented with any written declaration of trust which cites Milton Wasman as trustee. What does emerge from the record is that eight checks representing the net proceeds of the sale of Estates stock were issued by Cooper Investment to Milton R. Wasman, as trustee. We do not view this evidence, standing alone, as conclusive proof of the existence of an express trust. Furthermore, to constitute a valid trust there must be an indication of an intention to create a trust, property to which the trust pertains and a certain and ascertained object of the trust Bay Biscayne Co. v. Baile,supra.In Re Estate of Herskowitz v. Smith,338 So.2d 210 (Fla. Ct. App., 1976). A *481 trust exists where a trustee holds property for the benefit of an existing identifiable beneficiary. Bay Biscayne Co. v. Baile,supra. See Bogert, Trusts and Trustees, sec. 161 (1979 rev.). We have not been directed to the name of an indentifiable beneficiary who holds an equitable property interest in the alleged trust corpus. While the stock certificates which petitioner caused Estates to issue were registered under the name of Erma Palmer, the record discloses that this name was fabricated by those involved in the transaction. It is therefore apparent that Erma Palmer is not the required identifiable beneficiary. Nor may we say that All County was the identifiable beneficiary of the alleged trust.Petitioner introduced documents purporting to be a loan agreement entered into by All County and Milton Wasman. From these documents we may only conclude that some type of loan transaction was attempted. Nowhere do these documents disclose that All County was a cestui que trust. The source of Milton Wasman's trusteeship is likewise undisclosed. Thus, the lack of an identifiable beneficiary precludes our finding that petitioner served as trustee. After having thus eliminated the *482 possibility that petitioner acted in a fiduciary capacity in the sale of Estates stock we are left with the fact that Estates stock was sold through a brokerage account bearing petitioner's name and that checks representing the net proceeds were issued to petitioner, albeit as trustee. Petitioner endorsed the checks which were then cashed. Although it is evident that Robins and petitioner attempted to engage in a loan transaction with Estates stock as the subject of the loan, it is readily apparent to us that the stock was first sold by petitioner who then loaned the sales proceeds to Robins. Under this view of the transaction petitioner must be held accountable for the income tax on the sale of Estates shares whose issuance was attributable to petitioner and whose sale was effected through petitioner's brokerage account. Petitioner's efforts in issuing the shares to a fictitious name and then transferring them to his brokerage account for sale were less than proper. We, however, are not engaged in a fact finding mission to determine the exact boundaries of petitioner's impropriety relative to the securities transaction. Rather, our attention is focused on the resolution of the *483 question of whom is to be taxed on the sale of securities regardless of its propriety. The control exercised by petitioner over the issuance of the shares, the placement of the shares in petitioner's brokerage account and the checks evidencing the net proceeds of the stock sales which were issued to and endorsed by petitioner signal to us that petitioner has derived an accession to wealth for which he must be held accountable under the income tax laws. See Commissioner v. Glenshaw Glass Co.,348 U.S. 426 (1955); cf. James v. United States,366 U.S. 213 (1961). The final issue in this case involves respondent's contention that a part of the underpayments for each of the years 1967 through 1970 was due to fraud. Thus, respondent has determined that petitioner is liable for additions to tax under section 6653(b) for each of these years. Respondent bears the burden of proof by clear and convincing evidence, that any part of the underpayments for each of the years involved was due to fraud. Section 7454(a); Gilday v. Commissioner,62 T.C. 260 (1974); Rule 142(b). For the imposition of the fraud penalty the taxpayer must possess an intent to evade a tax believed to be owing. McGee v. Commissioner,61 T.C. 249 (1973), *484 affd. 519 F.2d 1121 (5th Cir. 1975). While fraud is never to be imputed or presumed, Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959), circumstancial evidence and reasonable inferences are proper bases upon which fraud may be found. Stoltzfus v. United States,398 F.2d 1002 (3rd Cir. 1968); Stone v. Commissioner,56 T.C. 213, 214 (1971); Otsuki v. Commissioner,53 T.C. 96 106 (1969).
We hold that respondent has proven by clear and convincing evidence that part of the underpayments for each of the years 1967 through 1970 was due to fraud. Petitioner did not file returns for the years 1967, 1968 and 1969. There is no doubt that petitioner, as an attorney for a period of 25 years, was fully aware of the necessity of filing returns to report the large amounts of income inuring to petitioner's benefit in those years. Cf. O'Connor v. Commissioner,412 F.2d 304 (2d Cir. 1969), affg. a Memorandum Opinion of this Court (taxpayer-accountant charged with knowledge of income tax rules and regulations). This observation is fortified by the fact that petitioner did indeed file income tax returns for years prior to 1962 and in fact represented an individual before the Internal Revenue *485 Service in his capacity as an attorney. Petitioner's insistence that he or his secretary mailed his 1969 tax return is hardly worthy of belief in light of the fact that respondent has no record of the filing, petitioner did not file returns for the 7 previous years and petitioner admittedly did not pay any tax for the 1969 taxable year. Furthermore, petitioner's conviction of making a false application to obtain a passport is indicative of petitioner's propensity to misdirect government authorities. Thus, we view petitioner's indication to Internal Revenue agents that he or his secretary mailed his completed 1969 return as a misleading statement tending to show fraud.[7]
Part of petitioner's underpayment for 1970 was similarly due to fraud. Petitioner has admitted that his gross income for 1970 was over $ 70,000, although he only reported gross income of $ 34,213.64. While it is true that petitioner's business expenses which were not deducted on his return were significant for the year, nonetheless the net result of his omission of substantial amounts of gross income has resulted in *486 an appreciable understatement of taxable income. [8] In view of the fact that petitioner did not even file returns for the years 1962 through 1969, we note that we have repeatedly held that consistent and substantial understatements of income are strong evidence of an intent to evade a tax believed to be owing. Estate of Hill v. Commissioner,59 T.C. 846 (1973); Vise v. Commissioner,31 T.C. 220, 227 (1958); Galant v. Commissioner,26 T.C. 354 (1956). Furthermore, it is apparent that petitioner kept his wife from seeing the joint return filed for 1970 by signing her name without her knowledge or permission. The inference we draw from this action is that petitioner recognized that the return was fraudulent. [9] *487 For the reasons detailed we uphold respondent's determination that petitioner is liable for additions to tax under section 6653(b) for the years 1967 through 1970.Since fraud has been found for each of the years and because petitioner filed no returns for the years 1967 through 1969 petitioner's contention that assessment of any income taxes is barred for the years in issue by the statute of limitations is erroneous. Section 6501(c)(1) and section 6501(c)(3). [10] *488 Our holding on the fraud issue also dispenses with the necessity of addressing respondent's contentions under sections 6651(a)(1) and 6653(a). To reflect the above and concessions made by the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Although petitioner filed a joint return for 1970 with his wife Mildred Wasman, he signed her name without her knowledge or permission and he has conceded that any deficiency should be computed using the married filing separate tax rates. The case of Mildred Wasman, docket No. 5577-77 was settled as evidenced by our order of December 19, 1979.↩
3. SEC. 7203. WILLFUL FAILURE TO FILE RETURN, SUPPLY INFORMATION, OR PAY TAX. Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $ 10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.
4. Amounts credited to petitioner's loan and exchange account which respondent currently asserts to be taxable to petitioner have been set out earlier in our findings. ↩
5. The parties have stipulated that the 18,000 shares of Estates stock were sold for a total price net of commissions of $ 79,744.60.↩
6. SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items.↩
7. See Moore v. Commissioner,T.C. Memo. 1977-275 and Sherman v. Commissioner,T.C. Memo. 1977-261↩.
8. Petitioner has admitted he received gross income of $ 71,338.27. Additionally we have found that $ 4,720 worth of credits to the account of Florida Guaranty entitled "Loans and Exchanges - Milton Wasman" was income to petitioner in 1970. Petitioner's business expenses were stipulated to be $ 32,358.83 for 1970. Thus petitioner's understatement of taxable income for 1970 is as follows: ↩
Gross Income
$ 76,058.27
Business Expense
32,358.83
Taxable Income
43,699.44
Taxable Income
as reported
by petitioner
34,213.64
Understatement
of taxable
income
$ 9,485.80
9. See Whitler, Jr. v. Commissioner,T.C. Memo. 1980-214↩.
10. Sections 6501(c)(1) and 6501(c)(3) which provide for the relevant exceptions to the 3-year statute of limitations of section 6501(a) provide as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. (3) No return.--In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. * * * (3) No return.--In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩